# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

SUSAN MONSLOW,

    Plaintiff,

    v.

MAZUMA CREDIT UNION AND CU
HOLDING COMPANY, LLC,

    Defendants.

Case No. 2:17-CV-02389-JAR-GEB

## MEMORANDUM AND ORDER

Plaintiff Susan Monslow brings this action against Defendants Mazuma Credit Union and CU Holding Company, LLC, alleging claims of *quid pro quo* gender discrimination, gender discrimination, and retaliation under Title VII of the Civil Rights Act of 1964 and the Kansas Act Against Discrimination ("KAAD"), K.S.A. 44-1001, and age discrimination under the Age Discrimination in Employment Act ("ADEA") and the KAAD. This matter is before the Court on Defendants' Motion for Summary Judgment (Doc. 63). For the reasons stated in this opinion, the Court **grants summary judgment** on Plaintiff's discrimination claims, **denies summary judgment** on Plaintiff's retaliation claim, and **denies summary judgment** on the issue of Mazuma's liability.

## I.    Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law."[1] In applying this standard, the Court views the evidence and all reasonable inferences therefrom

---

[1] Fed. R. Civ. P. 56(a).

in the light most favorable to the nonmoving party.[2]  "There is no genuine [dispute] of material fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party."[3]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[4]  A dispute of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[5]

The moving party initially must show the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law.[6]  In attempting to meet this standard, a movant who does not bear the ultimate burden of persuasion at trial need not negate the nonmovant's claim; rather, the movant need simply point out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim.[7]

Once the movant has met the initial burden of showing the absence of a genuine dispute of material fact, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[8]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[9]  Rather, the nonmoving party must "set forth specific facts that would be

---

[2] *City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010) (citing *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1210 (10th Cir. 2008)).

[3] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986)).

[4] *Wright ex rel. Tr. Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[5] *Adler,* 144 F.3d at 670 (citing *Anderson,* 477 U.S. at 248).

[6] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002), *cert. denied* 537 U.S. 816 (2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[7] *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[8] *Anderson,* 477 U.S. at 256; *Celotex,* 477 U.S. at 324; *Spaulding,* 279 F.3d at 904 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[9] *Anderson,* 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[10]  In setting forth these specific facts, the nonmovant must identify the facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[11]  To successfully oppose summary judgment, the nonmovant must bring forward "more than a mere scintilla of evidence" in support of his position.[12]  A nonmovant "cannot create a genuine issue of material fact with unsupported, conclusory allegations."[13]  Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[14]

## II.      Evidentiary Issues

Before discussing the uncontroverted facts in this case, the Court addresses Defendants' objections to the opinions offered in LaToya Rozof's affidavit and Larry Hayes' deposition testimony.[15]  Under Fed. R. Civ. P. 56, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence and show that the affiant or declarant is competent to testify on the matters stated."[16] Furthermore, a witness's testimony is only admissible if evidence supports a finding that the witness has personal knowledge of a matter.[17]  "Conclusory and self-serving affidavits are not

---

[10] *Mitchell v. City of Moore, Okla.,* 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler,* 144 F.3d at 670–71); *see Kannady,* 590 F.3d at 1169.

[11] *Adler*, 144 F.3d at 671.

[12] *Vitkus v. Beatrice Co.,* 11 F.3d 1535, 1539 (10th Cir. 1993).

[13] *Tapia v. City of Albuquerque,* 170 F. App'x 529, 533 (10th Cir. 2006) (citing *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1237 (10th Cir. 2004)).

[14] *Celotex,* 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[15] Plaintiff withdrew her designation of LaToya Rozof as a non-retained expert witness; therefore, Defendants' Motion to Exclude Expert Testimony is **denied as moot** (Doc. 61).  The Court will consider Defendants' other objections to Rozof's testimony separately.

[16] Fed. R. Civ. P. 56(c)(4); D. Kan. Rule 56.1(d).

[17] Fed. R. Evid. 602.

sufficient."[18]  Under the personal knowledge standard set forth above, an affidavit is

inadmissible if "the witness could not have actually perceived or observed that which he testifies

to."[19]  Accordingly, at the summary judgment stage, "statements of mere belief" in an affidavit

or declaration must be disregarded.[20]  The Court disregards any portion of these affidavits,

declarations, and depositions that are not based on personal knowledge.

Furthermore, testimony which embraces the "ultimate issue" or expresses legal opinions

is improper.[21]  Under Fed. Rules Evid. Rule 701,

> "if the witness is not testifying as an expert, his testimony in the
> form of opinions . . . is limited to those opinions . . . which are (a)
> rationally based on the perception of the witness, (b) helpful to a
> clear understanding of his testimony or the determination of a fact
> in issue, and (c) not based on scientific, technical, or other
> specialized knowledge within the scope of Rule 702."

The Court disregards any portion of these affidavits, declarations, and depositions that are

outside the limitations of Rule 701.

### III.    Uncontroverted Facts

The following facts are viewed in the light most favorable to Plaintiff.

#### A.    *Relationship of Mazuma and CU Holding*

Plaintiff, Susan Monslow, is a white female born in January 1962.  Defendants are

Mazuma Credit Union ("Mazuma"), a credit union based in Kansas, and CU Holding Company,

LLC ("CU Holding"), a wholly-owned subsidiary of Mazuma that operates as a credit union

servicing organization, providing various services to credit unions such as insurance, mortgage

---

[18] *Murray v. City of Sapulpa*, 45 F.3d 1417, 1422 (10th Cir. 1995) (citing *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991)); *see Johnson v. Potter*, No. 01-4182-SAC, 2004 WL 2823237, at *2 (D. Kan. Nov. 10, 2004).

[19] *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1200 (10th Cir. 2006) (citing *United States v. Sinclair*, 109 F.3d 1527, 1536 (10th Cir.1997)).

[20] *Id.*

[21] *Trotter v. Todd*, 719 F.2d 346, 349 (10th Cir. 1983).

title, payday lending, and marketing services.  Subsidiaries owned by CU Holding include Beyond Marketing, XtraCash, TruHome, and Insure KC ("IKC").  At all times relevant to this action, Brandon Michaels was President and CEO of Mazuma and Chairman of the Board of CU Holding; Michael Gleason served as the Chief Financial Officer for CU Holding, XtraCash, Simplifast, Beyond Marketing, and IKC; Larry Hayes, a 57-year-old African American, served as CEO of CU Holding and directly supervised Plaintiff; Plaintiff was Director of Insurance for IKC for CU Holding.

CU Holding maintains offices at Mazuma's corporate headquarters, but pays rent pursuant to a lease.[22]  The business cards used by Plaintiff and other IKC employees said "Mazuma," as did the name badges and team apparel provided to Plaintiff and other employees.[23]  Similarly, the marketing materials used by IKC referenced "Mazuma" on them, and were required to be branded identically to all Mazuma advertising in font and color.[24] Employees of Mazuma and CU Holding had mail addresses that included "@mazuma.org," and were included on the "all team" email group at Mazuma.[25]  In December 2017,  Mazuma moved a prior income stream of $17,000 from Mazuma to IKC to improve its financial appearance.[26]

Mazuma provided "a portion" of human resources functions for CU Holding.[27]  Mazuma Vice President of Human Resources LaToya Rozof testified that she "had responsibilities and functions with regard to the Mazuma subsidiary, CU Holding Company, other Mazuma subsidiaries, as well as the subsidiaries of CU Holding" and that "Mazuma HR processed some

---

[22] Declaration of Larry Hayes, Doc. 63-4 at ¶7.

[23] Doc. 67-30; Deposition of Larry Hayes, Doc. 67-3 at 237:21–238:4.

[24] Doc. 67-30.

[25] *Id*.

[26] Deposition of Larry Hayes, Doc. 67-4 at 407:6–408:17.

[27] Deposition of Brandon Michaels, Doc. 67-5 at 164:23–165:1.

of the personnel transaction work for the subsidiaries, and Mazuma also did the payroll and benefits."[28]  CU Holding's CFO Gleason testified that Mazuma's Human Resources did the work for CU Holding because CU Holding had no Human Resources employees.[29]  Specifically, Mazuma HR processed payroll, check deposits, employee benefits, and 401K benefits for employees of CU Holding and its subsidiaries.[30]  Mazuma also conducted the new employee orientation for all new employees of Mazuma and CU Holding and provided laptop computers to CU Holding employees.[31]

Plaintiff was the Director of Insurance for IKC from February 14, 2014 until May 9, 2016.  Hayes hired Plaintiff after the two met for an interview in early 2014.  Hayes did not interview anyone else for the position.  Per her employment agreement, Plaintiff was an at-will employee, and she could be terminated at any time and for any reason.[32]  Her starting salary was $108,000 per year plus benefits.

During the entirety of her employment, Plaintiff reported to Hayes.  At no point in her tenure at IKC did Plaintiff receive a written performance review, nor did she receive any written performance criticism, discipline, or reprimands from Hayes.[33]  Defendants do not allege any misconduct or lack of performance on the part of Plaintiff.   In his deposition, Hayes testified that Plaintiff worked very hard, giving great effort to improving the business.[34]  In February 2016, Hayes approved a 1.75 percent salary increase for Plaintiff, increasing her annual

---

[28] Declaration of LaToya Rozof, Doc. 67-19 at ¶4.

[29] Deposition of Michael Gleason, Doc. 67-6 at 37:12–20.

[30] Doc. 67-3 at 35-15-39; Doc. 67-5 at 171:4–172:15.

[31] Doc. 67-5 at 179:6-14, 166:3-14.

[32] Deposition of Susan Monslow, Doc. 63-2 at 60:20–24.

[33] Doc. 67-4 at 306:23–307:1

[34] Doc. 67-3 at 75:8, 74:23–75:3, 73:24–25.

compensation to $109,890.  Hayes stated to Plaintiff that he wished "[he] could give [her] more," and noted that there would be some extended earnings added to her compensation for the next year.[35]

### B.  Gender and Age Discrimination, Quid Pro Quo Gender Discrimination/Harassment

In the fall of 2014, Hayes told Plaintiff that he used Match.com and an interracial dating site to find women to date.[36]  Hayes showed Plaintiff profiles of women on the websites in whom he expressed interest, told her about these women, and commented on how they were like her. Plaintiff testified that Hayes "kept repeatedly drawing parallels between the women he was dating and what I referred to as his profile of the types of women he was dating and how similar they were to me."[37]  Plaintiff was not registered on either of the dating websites used by Hayes. Hayes had similar conversations regarding his use of the websites with his administrative assistant, Julia Hinds, as well as with other employees and associates of CU Holding, including some men.[38]

In late 2014, Hayes discussed with Plaintiff the various issues he was facing with his fiancé, Mary.  Hayes frequently asked Plaintiff questions about the status of her relationship with her husband, whether they argued, and how they resolved their arguments.  Hayes would close the door to Plaintiff's office when he had these conversations.

In early 2015, when Plaintiff was walking in the CU Holding parking lot during her lunch break, Hayes told her that she had "strong legs."[39]  Hayes would often comment on Plaintiff's

---

[35] Declaration of Susan Monslow, Doc. 67-29 at ¶2.

[36] Timeline, Doc. 63-2, Ex. 32 at 1.

[37] Doc. 67-2 at 189:4–15.

[38] *See* Doc. 63-5 at 56:12–57:1.

[39] Doc. 63-2, Ex. 32 at 1.

clothing "in an exaggerated way" and told her that certain colors looked "dazzling" on her and matched her skin tone "perfectly."[40]  He also told Plaintiff that one of her winter coats was his favorite on her, asked her if any item of clothing was new, who picked out her clothes, when she went shopping, if her husband went shopping with her, and if she picked out her husband's clothes.  Hayes also complimented Plaintiff's shoes.  Plaintiff did not solicit or encourage these comments.  Hayes initially made comments regarding Plaintiff's appearance about twice a month, but beginning in fall 2015 and continuing through spring 2016, he made them at least every week and oftentimes, on multiple occasions during a week.

In May 2015, at an office birthday party for Hayes with about ten attendees, Hayes hugged Plaintiff and attempted to kiss her on the lips, while bringing Plaintiff into his body as he hugged her closely.  Plaintiff turned her head and the kiss landed on her cheek.  Only Plaintiff was kissed in this way, and it was done in front of others.  Plaintiff commented to her co-worker afterward how "creepy" Hayes' conduct had been, and Plaintiff testified, "it made me sick to my stomach."[41]

In June 2015, Hayes told Plaintiff that he had purchased a golf lesson for her to be provided by a golf pro at a local club.  He told her that he wanted her to take the lesson with him during some evening.  When Plaintiff said the date that he picked would not work for her, he watched over her shoulder as she opened her calendar to find another date.  Plaintiff and Hayes played golf together twice, once at an outing after a planning session and once during an out-of-town business trip.  After a golf outing in October 2014, Plaintiff sent Hayes a text message calling it "a fun afternoon," thanking him for taking her golfing.[42]

---

[40] *Id.*

[41] Doc. 67-2 at 125:15–126:15.

[42] Doc. 63-2, Ex. 33.

In November 2015, Plaintiff and Hayes discussed a prepaid legal services company called LegalShield and one of its sales representatives, Verna Heath. Hayes told Plaintiff that Heath was white and that he had asked Heath out on dates many times, but that she had always said no. Hayes told Plaintiff that Heath was "really successful and made a lot of money" and that she was "hot," and reminded him of "an older" version of Plaintiff.[43] He suggested that if CU Holding partnered with LegalShield, Heath would date him. Hayes told Plaintiff, "I know you haven't been in the dating world for a long time, but this is how it's done. You do something for someone else and they do something for you."[44]

Later in November 2015, Plaintiff, Hayes, and Asa Groves, the director of XtraCash and SimpliFast, drove to Oklahoma City for a business trip. On their way home from the trip, the group stopped at a gas station. Plaintiff saw Hayes speaking to a man at the station. When he returned to the car, Plaintiff asked Hayes who the man was. Hayes replied that he did not know, but that he had told the man that Plaintiff was his wife because he did not want the man to ask the group for a ride. After they returned from the trip, Hayes told Plaintiff, "I liked you before we went on this trip but I like you even more now."[45]

In November 2015, prior to the business trip, Plaintiff went to Gleason and told him about Hayes comparing her to Heath, the golf lessons Hayes scheduled, the kiss at the birthday party, and the multitude of comments about her appearance. Plaintiff told Gleason that she was "sick and tired of Larry hitting on me."[46] After returning from the trip, Plaintiff reported the "wife" comment to Gleason and recapped the incidents she had previously reported. Gleason cut

[43] Doc. 63-2, Ex. 32 at 2.

[44] Doc. 67-2 at 140:9–24.

[45] Doc. 63-2, Ex. 32 at 2.

[46] Doc. 67-2 at 143:11–146:15.

Plaintiff off and said that he maintains a "go with the flow" attitude toward Hayes.[47] Gleason replied, "you know what Larry will do to you."[48]

In December 2015, Hayes scheduled a breakfast meeting with Plaintiff at a local restaurant and prepared an agenda for the meeting. Instead of going over the agenda, he told Plaintiff that he wanted to enjoy her company. He asked her if she liked the color of the sweater he was wearing, told her that he liked what she was wearing and that she always wore clothes that complimented her skin and hair tone, and asked if she was a natural redhead and what color her hair was when she was a child. He also asked her several questions about her husband, including what she liked that he cooked, whether they cooked together, if they drank wine while they cooked, and what kind of wine they liked.

Later in December 2015, Hayes came into Plaintiff's office and asked how a pair of new pants fit "while slowly gesturing to his crotch area."[49]

In January 2016, Hayes came into Plaintiff's office, shut the door, and took her coat from where it was hanging. He told her that it was his favorite coat of hers and that it made her look very attractive. He hugged it to his body, twisting back and forth, and then he buried his face in it, taking a deep breath, and told her that it smelled really great. Following this incident, Plaintiff immediately told Jesse Krenzer, an IKC employee, what had occurred and testified that "she was very shaken up by it."[50]

In early 2016, Hayes came into Plaintiff's office and told her that he found someone on Match.com who reminded him of her. He showed her a picture of the woman and told her that

---

[47] Doc. 63-2, Ex. 32 at 2.

[48] *Id.*

[49] *Id.*

[50] *Id.* at 170:7–16.

the woman had reddish-brown hair and liked horses, like Plaintiff. Hayes told Plaintiff that he intended to ask the woman on a date to go horseback riding, and Plaintiff asked him if he knew how to ride a horse. The two discussed his horseback riding experience.

In February 2016, Hayes saw an entry on Plaintiff's calendar indicating she planned to visit Funky Town, a Raytown, Missouri dance club. He came into Plaintiff's office and asked her about the calendar entry, asking if she danced, what she wore when she danced, and with whom she was going.

Later that month, Hayes told Plaintiff that he had scheduled a date with Kelly, a woman he met on Match.com. He showed Plaintiff a picture of Kelly, a white woman, and said he thought she might be well off because she owned a house in Leawood, Kansas. On the evening of the date, Hayes sent Plaintiff a text message indicating the date was "nothing to write home about."[51] Plaintiff responded, "Darn it! She seemed like she had a lot of good qualities. The search continues."[52] Hayes then responded with a picture of himself and Kelly with their heads close together and sticking their tongues out with a message stating, "Just kidding. Having a great time."[53]

After this incident, in February 2016, Plaintiff once again discussed Hayes' conduct with Gleason. She told him about Hayes' "proclivity for white women" and told Gleason that Hayes' personal comments and behaviors toward her had continued and were getting out of hand.[54] She also told Gleason about Hayes calling her "hot," about his comments about her appearance, and

---

[51] Doc. 63-2, Ex. 32 at 3.

[52] *Id.*

[53] *Id.*

[54] *Id.*

about the coat hugging incident.[55]  When Plaintiff asked Gleason what she should do, he replied "I wouldn't complain about him if I were you."[56]  Plaintiff testified she wanted to put a stop to the behaviors without jeopardizing her job.[57]  Plaintiff further testified that she hoped Gleason would at least talk to Hayes, saying she thought "at a minimum, he should tell Larry to stop. He was an officer in the company."[58]

In March 2016, Hayes called Plaintiff at about 7 p.m. on a Saturday evening when she was at a dinner with friends.  He told her that he was in a hotel room in California, and wanted to talk about upcoming marketing ideas.  Plaintiff could hear a woman in the room giggling and making comments, but she could not hear what she was saying.  Hayes told Plaintiff that Kelly, the woman whom he had been on a date with the previous month, was in the room with him.  On a separate occasion, Hayes told Plaintiff that the first time he slept with Kelly, her cat was on the bed, which annoyed him.

Plaintiff testified she believed she "was making it very clear that [she] did not want to continue to have those conversations" with Hayes.[59]  She did not explicitly tell Hayes to stop, but would rather "try to change the subject" or "answer my phone."[60]  Plaintiff testified that this was because she knew Hayes had a bad temper, and so she attempted to be mild and professional in indicating that his conduct was inappropriate and unwanted.  She testified that she believed she

---

[55] *Id.*

[56] *Id.*

[57] Doc. 67-2 at 153:5–155:5, 187:20–189:15.

[58] *Id.* at 155:1–5.

[59] *Id.* at 163:17–164:2.

[60] *Id.* at 103:2–11.

could not make a more forceful response "without fear of repercussion."[61]  According to Heather

Murphy, Hayes' administrative assistant, Hayes would raise his voice and yell in the office.[62]

In his deposition, Hayes admitted that each of the events alleged, had they occurred,

would have been improper, violated CU Holding's policies, and could reasonably be perceived

as flirtation and seeking a dating or romantic relationship.[63]

### C. Defendants' Decision to Eliminate Plaintiff's Position

From the outset of the insurance venture at CU Holding, it was anticipated by the

company that there would be a five-year "Valley of Death" period of budgeted losses before the

entity became profitable.[64]  According to IKC Board Member Chris Stegall, the term "Valley of

Death" indicates the expectation of "negative returns, negative profit numbers until you reach a

point in time when the book of business is built-up enough that the book of business is paying

off, and that coupled with the new business that you're writing every year makes you

profitable."[65]  Mr. Stegall testified that the anticipated "Valley of Death" period for IKC was five

years, which was typical in the insurance business.[66]  In 2014, IKC had net losses of $207,440.[67]

In 2015, IKC had net losses of $233,275.[68]  In the first four months of 2016, IKC had a net loss

of $71,261.[69]

---

[61] *Id*. at 164:2–8

[62] Doc. 67-11 at 20:11–18.

[63] For purposes of summary judgment, the events detailed in Section III.B are uncontroverted. The Court notes Defendants' objection to Mr. Hayes' testimony and disregards the legal conclusions in his deposition as inadmissible. Fed. R. Evid. 701.

[64] Doc. 67-3 at 90:6–91:10.

[65] Doc. 67-8 at 28:10–29:10.

[66] *Id*. at 29:11-15, 33:14–20.

[67] Doc. 63-2, Ex. 39.

[68] *Id*.

[69] *Id*.

IKC and CU Holding board members praised Plaintiff's job performance in the months and days leading up to her termination. At the February 24, 2016 IKC board meeting, Hayes noted that Plaintiff's work on increasing the number of referrals had been "fantastic."[70] Under Plaintiff, IKC obtained its highest five revenue months between January and May 2016. Hayes testified that "revenues were doing very well under Ms. Monslow," insurance revenues were trending significantly upward based on new programs instituted by Plaintiff, and the two highest revenue months were April and May of 2016.[71] At the May 5, 2016 IKC board meeting, it was reported that the "It Takes Two" referral program, led by Plaintiff, had produced 198 referrals in March, and that the total annual revenue from premiums had risen from $181,830 in 2014 to $581,000 in May 2016.[72] Nonetheless, at the May 3, 2016 CU Holding board meeting, Hayes said he "was on the heels of a decision in about 45 days" after letting the "It Takes Two Campaign . . . play out for the end of May."[73]

Following the May 5 board meeting, Plaintiff told Gleason that she had "had it" and that she was going to report all of Hayes' inappropriate conduct to Michaels.[74] Plaintiff was prompted to do this after Hayes stated, "for the board record, I want to report the agency's lack of performance."[75] Gleason asked her to think about it for a few days before she did anything.[76] Plaintiff never reported any allegations against Hayes to Michaels.

---

[70] Trans. of Recording of Feb. 24, 2016 IKC/MI/Mazuma Insurance Services Board Meeting, Doc. 67-23 at 2:18–5:13.

[71] Docs. 67-3 at 222:19–21, 67-4 at 404:22–405:11.

[72] Doc. 67-4 at 331:14–16, 333:15–334:6.

[73] Doc. 67-24 at 13:3–25, 14:1–24.

[74] Doc. 63-2, Ex. 15.

[75] Doc. 200:19–201:12.

[76] Doc. 67-2 at 203:8–204:18.

On May 9, 2016, Plaintiff went to Hayes' office pursuant to a "meeting maker" she received on Friday, May 6. Hayes informed Plaintiff that CU Holding was eliminating her position. Plaintiff did not receive advanced notice that her position was being eliminated.[77] Hayes did not provide an explanation or reason for the decision at the meeting. Plaintiff was immediately escorted to her office to get her belongings and then out of the building, and was prohibited from returning to the premises.[78] She was not provided the opportunity to seek positions elsewhere within CU Holding or Mazuma, nor did she receive assistance from Hayes, CU Holding, or Mazuma in seeking other employment.[79] She was told she would only receive a "neutral" job recommendation and that she was not eligible for rehire at Mazuma, CU Holding, or any of their subsidiaries.[80] Murphy was present for part of the termination meeting with Plaintiff and prepared a memo related to the meeting.[81]

Hayes testified that he made the final decision to fire Plaintiff after consulting with Brandon Michaels, Mike Gleason, and others.[82] He testified that he was told, "do what you think is the right thing for the business."[83] Hayes has no documents memorializing any consideration, discussions, or meetings regarding elimination of Plaintiff's position, nor does he have any document mentioning the elimination of the position prior to the date on which she was terminated. No vote was taken at any board meeting concerning the potential elimination of Plaintiff's position. Hayes stated that the termination was because of the elimination of

---

[77] Docs. 67-2 at 230:17–232:24, 67-4 at 394:5–13.

[78] Docs. 67-2 at 230:17–232:24, 67-29.

[79] Doc. 67-2 at 254:5–15.

[80] *Id.*; Doc. 67-29, ¶ 4.

[81] Minutes of the IKC Elimination of Director of Insurance Position May 9, 2016, Doc. 67-21.

[82] Deposition of Larry Hayes, Docs. 63-3 at 108:1–109:25, 67-3 at 133:4–134:3, 67-4 at 357:17–358:3.

[83] Doc. 67-4 at 357:17–23.

Plaintiff's position and had nothing to do with her performance, but Hayes also stated at the August 2016 CU Holding board meeting that "part of it was a personality thing."[84] Hayes testified that he met with Gleason after the May 5 meeting, prior to making the final decision to eliminate the position on May 6.[85] Gleason testified that he did not recall Plaintiff reporting Hayes' inappropriate conduct to him.[86]

Regarding the timing of his decision to eliminate Plaintiff's position, Hayes testified that: (1) he was not contemplating eliminating Plaintiff's position as of February 2016;[87] (2) he discussed the elimination of the position with Plaintiff in "ongoing conversations" in February 2016;[88] (3) he was considering eliminating Plaintiff's position for six to nine months prior to May 2016;[89] and (4) he made the decision in March 2016 to eliminate Plaintiff's position.[90]

### D. Company Policies

The CU Holding Employee Handbook states that "employees who have satisfactorily completed their introductory period and whose employment was terminated in good standing are eligible for rehire."[91] The policy also provides that, "[f]ormer employees may submit an application and resume for any job vacancy with the Company. Such applications will be considered with other internal/external applications, based on qualifications for the open position."[92] In January 2017 at the IKC budget meeting, Hayes stated, "[i]t's my philosophy that

---

[84] Docs. 67-3 at 101:7–105:5, 67-4 at 358:11–18.

[85] Doc. 67-4 at 365:16–24.

[86] Deposition of Michael Gleason, Doc. 63-9 at 165:10–13.

[87] Doc. 67-4 at 312:9–12.

[88] Doc. 67-3 at 77:10–15.

[89] Id. at 135:13–136:1, 173:10–174:12.

[90] Doc. 67-4 at 374:1–24.

[91] Doc. 67-26.

[92] Id.

if you're going to displace people, you have to try to find a soft landing for them. If you can't, you should at least try to find places for them to interview."[93]

Mazuma COO Deonne Christensen testified that in other instances in which positions were eliminated by Mazuma, many of the persons whose jobs were being eliminated received opportunities to seek other employment at Mazuma and they received advanced notice regarding job eliminations.[94] Christensen also testified that she was unaware of any other person whose position was eliminated being escorted out of the building.[95]

LaToya Rozof was the Vice President of Human Resources for Mazuma and CU Holding from August 2013 until June 2016. Rozof testified she "was shocked when approached about doing a severance for [Plaintiff]."[96] She testified that she would not have approved the elimination, that it did not follow company procedures in that there had been no discussion or planning for the elimination of the position, and that with regard to the severance agreements, the employee is not supposed to have to sign them that day.[97] She testified that Human Resources did not know anything about the position being eliminated until asked to cut the payroll checks.[98] On the day Hayes terminated Plaintiff, Rozof emailed Hayes and requested she be provided with information as to the reason for Plaintiff's dismissal, eligibility for rehire, and other human resource issues; Hayes responded that Plaintiff was not eligible for rehire.[99]

---

[93] Doc. 67-4 at 392:12–393:19.

[94] Deposition of Deonne Christensen, Doc. 67-10 at 20:24–21:15.

[95] *Id.* at 24:13–18.

[96] Declaration of LaToya Rozof, Doc. 67-19 at ¶13.

[97] *Id.*

[98] *Id.*

[99] Doc. 67-3 at 275:21–276:5.

Hayes testified that he had not received sexual harassment or diversity training in 2014 or 2015, that he had not required such training of others at CU Holding, and that such training was voluntary.[100] A December 29, 2015 email from Mazuma's Belinda Seller states that Hayes was the only person who had not fully completed the training.[101] Hayes testified that he agreed that the CEO sets the tone for a company with regard to compliance with sexual harassment laws.[102] *Quid Pro Quo* sexual harassment is one of the topics addressed in the videos, which include discussion about how comments about the appearance or clothing of a subordinate employee can be considered sexual harassment, and that unwelcome kissing of a subordinate employee could also be considered sexual harassment.[103]

### E.  Other CU Holding Employees

In the summer or early fall of 2014, CU Holding hired two additional producers for IKC, Jesse Krenzer and Zak Kahlemsky. Each received a base salary between $30,000 and $35,000, with the remainder of their compensation based on commissions.[104] Kahlemsky was terminated for performance reasons in February 2015. In October 2015, CU Holding hired an additional producer, Ben Woschnick, who was compensated in the same way.

Following her termination, Plaintiff's responsibilities shifted to Jesse Krenzer, although his job title and compensation did not change.[105] Krenzer left the company when his position was eliminated in February 2017. Krenzer was given advance notice prior to the elimination of

---

[100] *Id.* at 45:9-51:1, 47:2–11.

[101] *Id.* at 51:15–52:17.

[102] *Id.* at 52:18–24.

[103] *Id.* at 49:13–51:8.

[104] Doc. 63-2 at 218:19–21.

[105] Doc. 67-20, ¶ 9.

his position.[106]  He was also given the opportunity to continue employment with a 100%

commission-based compensation structure.[107]

In February 2017, CU Holding entered into a shared-services agreement with a third-

party insurance agency operated by Juan Luengo, through which the agency and CU Holding

shared expenses and commissions generated by IKC.[108]  IKC considered hiring Mr. Luengo in-

house as an employee to replace Plaintiff and discussed him becoming the Chief Operating

Officer for IKC.[109]

As of April 2016, IKC was closer to budget estimates than Simplifast, another CU

Holding subsidiary.[110]  The Simplifast Director, Asa Groves, was not terminated or reprimanded,

and the director position was not eliminated despite long periods of unprofitability.  Groves was

also the director of XtraCash, which was consistently profitable.[111]

Several other CU Holding subsidiaries struggled financially.  Beyond Marketing

struggled for ten years before it was ultimately shut down.[112]  When Beyond Marketing was shut

down in December 2017, its Director, Kat Anstine, and other employees received three months

advance notice of when their employment would end and positive performance

recommendations by Hayes.[113]

---

[106] *Id.*, ¶ 11

[107] *Id.*

[108] Doc. 63-3 at 229:5–230:17.

[109] Doc. 67-14 at 12:24–13:7, 18:24–21:7.

[110] Doc. 67-13 at 34:4–24.

[111] *Id.* at 14:14–22.

[112] Doc. 67-4 at 430:9–19.

[113] Docs. 67-4 at 435:18–436:19, 67-12 at 32:5–15, 67-6 at 33:19–34:3.

**IV.     Discussion**

*A.     Age and Gender Discrimination*

When a plaintiff relies on circumstantial evidence to prove discriminatory termination,

courts apply the familiar three-step burden-shifting framework set forth in *McDonnell Douglas*

*Corporation v. Green*.[114]   The Tenth Circuit has described the framework as follows:

> *McDonnell Douglas* first requires the aggrieved employee to
> establish a prima facie case of prohibited employment action . . . .
> If the employee makes a prima facie showing, the burden shifts to
> the defendant employer to state a legitimate, nondiscriminatory
> reason for its adverse employment action . . . .  If the employer
> meets this burden, then summary judgment is warranted unless the
> employee can show there is a genuine issue of material fact as to
> whether the proffered reasons are pretextual.[115]

Here, Plaintiff alleges gender discrimination in violation of Title VII and the KAAD, and

age discrimination in violation of the ADEA and the KAAD.  In support of her claims, Plaintiff

alleges that circumstantial evidence supports her discrimination claims, including (1) differential

treatment compared to the two younger, male producers; (2) differential treatment compared to

Juan Luengo, a younger, male employee; (3) differential treatment compared to Kat Anstine, a

younger female, and Asa Groves, an older male, directors of other CU Holding subsidiaries; and

(4) evidence showing Defendants' gender and age-biased cultures.

To establish a prima facie case of gender or age discrimination, Plaintiff must

demonstrate (1) membership in protected class; (2) adverse employment action; and (3) that the

adverse employment action occurred under circumstances giving rise to an inference of

---

[114]*Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800–07 (1973)); *Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 514 (10th Cir. 2015).

[115]*Plotke*, 405 F.3d at 1099.

discrimination.[116]  The burden imposed on a plaintiff at the prima facie stage is "not onerous."[117]

The Court assumes, *arguendo*, that Plaintiff has established a *prima facie* case.  Plaintiff's claim

fails as a matter of law, however, because she cannot establish a genuine issue of material fact

that her termination was based on her gender or age.

Under the *McDonnell Douglas*, the burden shifts to Defendants to establish a legitimate,

non-discriminatory reason for the termination.  Defendants argue that Plaintiff's position was

eliminated for financial reasons.  In the time Plaintiff was employed with CU Holding, net losses

totaled over $200,000 annually.  Plaintiff was earning a salary of over $108,000 per year plus

benefits, a large fixed expense in the entity's budget.  Workforce reduction as a cost-cutting

measure is a legitimate, non-discriminatory reason for termination.[118]  The termination of

Plaintiff's position reduced IKC's expenses, and losses, by thousands of dollars each year.

Accordingly, the Court finds that Defendants have offered a legitimate, non-discriminatory

reason for Plaintiff's termination.

To defeat summary judgment, Plaintiff then must show that Defendants' explanation is

pretextual.  A Plaintiff can establish pretext in three ways: (1) presenting evidence that

defendant's stated reason for the adverse action was false; (2) presenting evidence that defendant

acted contrary to written company policy; or (3) presenting evidence that defendant acted

---

[116] *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 800 & n.5 (10th Cir. 2007) (discussing how elements of prima facie case in discrimination cases vary depending on context).  In the Tenth Circuit, a prima facie case no longer requires a "similarly-situated person" comparison.  *See Sorbo v. UPS*, 432 F.3d 1169, 1173 (10th Cir. 2005).  While the third element may be shown by evidence that the employer treated similarly-situated employees more favorably, "such proof is just one sufficient means to do this and should not itself be mistaken as an indispensable element of the prima facie case." *Id.  See also Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1151 (10th Cir. 2008) (prima facie case for ADEA); *Smith v. Oklahoma ex rel. Tulsa Cty. Dist. Attorney*, 245 F. App'x 807, 811 (10th Cir. 2007) (prima facie case for gender).

[117] *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

[118] *See DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 972 (10th Cir. 2017).

contrary to an unwritten policy or practice.[119]  In the context of a discrimination case, evidence of pretext may include whether plaintiff was treated differently from similarly-situated employees.[120]

First, Plaintiff cannot show that she was similarly-situated to Jesse Krenzer, Ben Woschnick, Juan Luengo, Kat Anstine, or Asa Groves.  It is true that "[w]hether two employees are similarly situated ordinarily presents a question of fact for the jury."[121]  "However, at summary judgment, the court must determine whether 'plaintiff has adduced enough evidence to support a finding that the [other employee] and plaintiff were sufficiently similarly situated to support an inference of discrimination.'"[122]  In order to establish disparate treatment of comparators, they must be "similarly situated in all relevant respects."[123]  "Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline."[124]  "[The] court should also compare the relevant employment circumstances such as work history and company policies, applicable to the plaintiff and the intended comparable employees."[125]

A reasonable jury could not find Plaintiff to be similarly situated in all relevant respects to Jesse Krenzer, Ben Woschnick, Juan Luengo, Asa Groves, or Kat Anstine.  Krenzer and Woschnick were hired at a salary of $30,000 to $35,000 plus commission, whereas Plaintiff

---

[119] *Fugett v. Sec. Transp. Servs., Inc.*, 147 F. Supp. 3d 1216, 1237 (D. Kan. 2015) (citing *Kendrick v. Penske Transp. Servs, Inc.*, 220 F.3d 1220, 1230 (10th Cir.2000)).

[120] *See Watts v. City of Norman*, 270 F.3d 1288, 1293 (10th Cir. 2001); *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1194 n.6 (10th Cir.2000).

[121] *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1117 (10th Cir. 2007) (quoting *George v. Leavitt*, 407 F.3d 405, 414 (D.C. Cir. 2005)).

[122] *Id.*

[123] *Arambaru v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997).

[124] *Id.*

[125] *Id.*

earned a salary of over $108,000 per year and served as their supervisor. Juan Luengo was the director of a third-party insurance agency that entered into an agreement with IKC in 2017 to share expenses and commissions; unlike Plaintiff, he was not directly employed by CU Holding. And Kat Anstine and Asa Groves served as Directors of other CU Holding subsidiaries, which were separately incorporated from IKC, participated in different industries, and subject to different budgets and financial considerations. Although Hayes supervised both Anstine and Groves, Plaintiff has alleged no facts to demonstrate they were similarly situated with regard to evaluation standards, work history, or company policies. Anstine's position was eliminated when CU Holding closed her company, Beyond Marketing, based on poor financial performance. Groves directed two separate companies: Simplifast, which struggled financially, and Xtracash, which was consistently profitable. The Court finds that no reasonable jury could find that Plaintiff was similarly situated to any of the above employees to support a finding of pretext.

Second, Plaintiff's allegations of a biased culture do not support a finding of pretext. Plaintiff points to age-related statements made by Michaels to Mazuma employees (and not to Plaintiff or in Plaintiff's presence) in support of her contention that there was an age-biased culture. "Isolated comments, unrelated to the challenged action" are insufficient to support finding of discriminatory animus.[126] Therefore, Michael's statements are insufficient to establish an age-biased culture. In support of her gender-bias claim, Plaintiff points to Hayes' failure to complete sexual harassment training, his failure to require others to complete mandatory training, and two sexual harassment allegations against prior Mazuma Vice Presidents. "[M]ere

---

[126] *Vasilescu v. Black & Veatch Pritchard, Inc.*, 155 F. Supp. 2d 1285, 1293 (D. Kan. 2001) (citing *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir. 1994)).

conjecture that [an] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment."[127] Here, Plaintiff's contention that these isolated facts support an inference of discrimination is "mere conjecture," and insufficient to create an inference of discriminatory intent. Accordingly, Defendants' motion for summary judgment is granted on Plaintiff's claims for gender and age discrimination.

### B. Quid Pro Quo Harassment

Plaintiff alleges *quid pro quo* sexual harassment in violation of Title VII and the KAAD. "*Quid pro quo* harassment occurs where specific benefits or employment are conditioned on sexual demands by the victim's supervisor."[128] As above, where Plaintiff relies on circumstantial evidence to prove discriminatory termination, the *McDonnell Douglas* test applies.[129]

To establish a *prima facie* case of *quid pro quo* sexual harassment, the plaintiff must establish (1) that her supervisor had authority to materially alter the terms and conditions of plaintiff's employment; (2) that her supervisor demanded sexual favors; and (3) that plaintiff's rejection of her supervisor's sexual demands resulted in job detriment.[130]

The existence of a demand of sexual favors is a question of fact based on the totality of the circumstances.[131] For the purposes of summary judgment, the alleged incidents are

---

[127] *Morgan v. Hilti*, 108 F.3d 1319, 1323 (10th Cir. 1997) *(quoting Branson v. River Coal Co.*, 853 F.2d 768, 772 (10th Cir.1988)).

[128] *Rettiger v. IBP, Inc.*, 980 F. Supp. 1182, 1187 (D. Kan. 1997).

[129] *See Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005).

[130] *Rettiger*, 980 F. Supp. at 1189. It is undisputed that Hayes had authority to materially alter the terms and conditions of Plaintiff's employment. Hayes hired and fired Plaintiff.

[131] *See e.g.*, *Robinson v. Cavalry Portfolio Servs., LLC*, 365 F. App'x 104, 118 (10th Cir. 2010); *see also Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 69 (1986) ("the trier of fact must determine the existence of sexual harassment in light of 'the record as a whole' and 'the totality of circumstances, such as the nature of the sexual advances and the context in which the alleged incidents occurred.'").

undisputed.  The Court need not decide whether the facts of the present case constitute a demand for sexual favors because Plaintiff has failed to allege any facts showing that her rejection of Hayes' conduct resulted in her termination.

To survive summary judgment on a *quid pro quo* harassment claim, Plaintiff must show that a reasonable jury could find that Mr. Hayes conditioned concrete employment decisions on her submission to sexual favors.[132]  Here, the record fails to support any suggestion that Plaintiff's rejection of Hayes' flirtations resulted in her termination.  First, Plaintiff has alleged no facts that she rejected Hayes' flirtations.  Plaintiff admits that she did not explicitly reject Hayes' flirtations, but would rather "try to change the subject" or "answer my phone."[133]  Notably, the Tenth Circuit has held that *quid pro quo* harassment does not have to be explicit.[134]  However, Plaintiff's rejection of the unwanted sexual conduct must be the *cause* of Plaintiff's termination.[135]  Drawing all inferences in the light most favorable to Plaintiff, Plaintiff has failed to allege any facts linking her termination to the occasions she subtly rejected Hayes behavior.  To the extent that Plaintiff alleges that her rejection was through her November 2015 or February 2016 reports of inappropriate behavior to Gleason, or her May 4, 2016 statement to Gleason that she had "had it" and she was going to report Hayes inappropriate conduct to Michaels, Plaintiff has conflated her *quid pro quo* claim with her claim for retaliation, analyzed separately below.[136]

---

[132] *Pinkerton v. Colorado Dep't of Transp.*, 563 F.3d 1052, 1060 (10th Cir. 2009) (citing *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1413–14 (10th Cir.1987)).

[133] Doc. 67-2 at 103:2-11.

[134] *Hicks*, 833 F.2d at 1414; *see also Brandau v. State of Kansas*, 968 F. Supp. 1416, 1421 (D. Kan. 1997). (holding "there is no requirement of an express statement from the harasser linking job benefits to plaintiff's submission to sexual advances.")

[135] *See Benhardt v. Bd. of Cty. Comm'rs of Cty. of Wyandotte*, 9 F. Supp. 2d 1252, 1261 (D. Kan. 1998) (finding "under a *quid pro quo* theory of sexual harassment, the…rejection of the harassment by an employee must be…the *cause* of a tangible job detriment.")(emphasis added).

[136] Doc. 63-2, Ex. 15.

Plaintiff has failed to establish a *prima facie* case for *quid pro quo* discrimination. Accordingly, the Court finds Defendants are entitled to judgment as a matter of law on Plaintiff's claim for *quid pro quo* gender discrimination.

### C. Retaliation

Plaintiff alleges that Defendants engaged in retaliation in violation of Title VII and the KAAD by terminating her employment based on her reporting of Hayes' unwelcome sexual advances. As discussed above, Plaintiff's retaliation claim is analyzed under the *McDonnell Douglas* burden shifting framework.[137] To establish a *prima facie* case of retaliation, a plaintiff must show (1) she engaged in protected opposition to discrimination; (2) that a reasonable employee would have found the challenged action materially adverse; and (3) a causal connection exists between the protected activity and the adverse action.[138]

Protected opposition protects an individual when they have "opposed any practice made unlawful employment practice by [Title VII]."[139] In determining whether an employee's complaints constitute protected activity, "[t]he relevant question…is not whether a formal accusation of discrimination is made but whether the employee's communications to the employer *sufficiently convey* the employee's *reasonable concerns* that the employer has acted or is acting in an unlawful discriminatory manner."[140] Importantly, it is not whether an employer in fact engaged in conduct which violates Title VII, but rather whether the employee had a "good faith belief that Title VII ha[d] been violated."[141] In the present case, Plaintiff reported her

---

[137]*Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir. 1999).

[138] *Amro v. Boeing Co.*, 232 F.3d 790, 796 (10th Cir. 2000).

[139] 42 U.S.C.A. § 2000e-3.

[140] *Garcia-Paz v. Swift Textiles, Inc.*, 873 F. Supp. 547, 560 (D. Kan. 1995) (emphasis added).

[141] *Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002) (quoting *Love v. Re/Max of Am., Inc.*, 738 F.2d 383, 385 (10th Cir. 1984)).

reasonable concerns about her employer's inappropriate sexual behavior on three occasions. Her repeated reports of inappropriate sexual conduct to the company's chief financial officer sufficiently conveyed her concerns; accordingly, her reports are protected opposition under Title VII.[142]

A causal connection exists between the protected activity and the materially adverse action "where the plaintiff presents evidence of circumstances that justify an inference of retaliatory motive."[143] "In order to make a *prima facie* case, one must only introduce evidence from which an inference can be drawn that an employer would not have taken the adverse action had the employee not filed prior discrimination charges."[144] Courts typically consider "protected conduct *closely followed by* adverse action" as sufficient evidence.[145]

In the present case, Plaintiff reported Hayes' inappropriate conduct to CU Holding CFO Mike Gleason on three occasions: November 2015, February 2016, and May 4. 2016. On May 4, 2016, Plaintiff told Gleason that she had "had it," and that she was going to report Hayes' conduct to Michaels.[146] Gleason told her to think about it for a few days before she did anything. On Friday, May 6, Plaintiff received a meeting maker invite for a meeting with Hayes the following Monday morning. On the morning of May 9, Hayes informed Plaintiff that her position was eliminated. She was immediately escorted from the building, prohibited from returning to the premises, and told that she would only receive a neutral job recommendation and that she was not eligible for rehire.

---

[142] Plaintiff also argues that her rejection of Hayes' conduct constituted protected activity. As discussed above, the Court finds that Plaintiff has not alleged facts to support a finding that she rejected Hayes.

[143] *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1091 (10th Cir. 2007).

[144] *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

[145] *Id.* (emphasis added).

[146] Doc. 63-2, Ex. 15.

"Unless there is very close temporal proximity between the protected activity and the retaliatory conduct, the plaintiff must offer additional evidence to establish causation."[147] Although temporal proximity is not a specific amount of time, the Tenth Circuit has found that less than two weeks is "alone sufficient to establish a causal connection."[148] Here, the timeline clearly demonstrates temporal proximity. Defendants argue that temporal proximity is meaningless here because Plaintiff has not shown that Hayes knew about her complaints. "[Proximity]…is meaningless unless those who caused the alleged retaliatory act to occur…[were] aware…" of the protected activity.[149] However, Plaintiff has presented evidence from which a jury could infer Hayes knew about Plaintiff's reports. It is uncontroverted that Hayes met with Gleason after the May 5 meeting, prior to making the final decision to eliminate the position on May 6. Further, Hayes testified that he made the decision to eliminate the position after consulting with others, including Gleason. At summary judgment, all inferences are drawn in Plaintiff's favor. Given the temporal proximity and surrounding circumstances, Plaintiff has established a *prima facie* case of retaliation.

Under *McDonnell Douglas*, the burden shifts to Defendants to establish a legitimate, non-discriminatory reason for the termination. As discussed above, Defendants argue that Plaintiff's position was eliminated for financial reasons, namely, to eliminate a large fixed expense in IKC's budget. Workforce reduction as a cost-cutting measure is a legitimate, non-discriminatory reason for termination.[150] The termination of Plaintiff's position reduced IKC's expenses, and

---

[147] *O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001).

[148] *Argo v. Blue Cross & Blue Shield of Kan., Inc.,* 452 F.3d 1193, 1202 (10th Cir.2006) (citing *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1228 (10th Cir. 2008)).

[149] *Hysten v. Burlington N. & Santa Fe Ry. Co.*, 296 F.3d 1177, 1184 (10th Cir. 2002).

[150] *See DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 972 (10th Cir. 2017).

losses, by thousands of dollars each year. Accordingly, the Court finds that Defendants have offered a legitimate, non-discriminatory reason for Plaintiff's termination.

To defeat summary judgment, Plaintiff then must show that Defendants' explanation is pretextual. Pretext may be shown by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."[151] A Plaintiff can show pretext through (1) evidence that defendants' stated reason for the adverse employment action was false, *i.e.* unworthy of belief; (2) evidence that defendant acted contrary to a written company policy prescribing the action to be taken under the circumstances; or (3) evidence that defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting plaintiff."[152]

Plaintiff argues that the reason proffered by Defendants is pretextual because (1) the "Valley of Death" was expected; (2) Plaintiff's performance was praised in the months and days leading up to her elimination; (3) there was no Board of Directors' vote or advanced notice of her elimination; and (4) circumstantial evidence surrounding her termination supports an inference that the proffered reason is pretextual.

Defendants cite the business judgment rule as the lens through which the Court should view Plaintiff's arguments. In evaluating pretext, "the relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs."[153] The "Valley of Death" is a term used to

---

[151] *Argo*, 452 F.3d at 1203.

[152] *Fugett v. Sec. Transp. Servs., Inc.*, 147 F. Supp. 3d 1216, 1237 (D. Kan. 2015) (citing *Kendrick v. Penske Transp. Servs, Inc.*, 220 F.3d 1220, 1230 (10th Cir.2000)).

[153] *Stover v. Martinez*, 382 F.3d 1064, 1076 (10th Cir. 2004) (quoting *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1318 (10th Cir.1999)).

describe a period of budgeted losses prior to profitability. Plaintiff argues that because the losses experienced under Plaintiff were expected and budgeted for, Defendants' financial justification is pretextual. The Court does not disturb honestly-held, good faith business judgments.[154] However, the Court need not evaluate whether this particular business decision was honestly-held because Plaintiff has presented other evidence from which a jury could infer that Defendants proffered non-discriminatory reason is false, and Defendants acted contrary to company practice in Plaintiff's termination.

As discussed above, Plaintiff has presented evidence of close temporal proximity between her May 4 complaint and her termination. "To raise a fact issue of pretext, plaintiff must present evidence of temporal proximity plus circumstantial evidence of retaliatory motive."[155] Plaintiff has presented other circumstantial evidence from which a jury could infer motive:

- LaToya Rozof, VP of HR, testified that Plaintiff's termination "did not follow company procedures" and she was "shocked" when approached about doing a severance for Plaintiff.[156] According to Rozof, unlike typical company procedure, there was no discussion or planning prior to elimination of Plaintiff's position. For example, when CU Holding closed Beyond Marketing for financial reasons, both the director and other employees were given over three months advanced notice of the decision.

- Plaintiff's performance as director of IKC was appreciated and satisfactory, she received no written performance criticism, discipline, or reprimands and was given a raise in February 2016, and she was described as doing "fantastic" work in the time leading up to

---

[154] *See Young v. Dillon Companies, Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006).

[155] *Fugett*, 147 F. Supp. 3d at 1237.

[156] Doc. 67-19, ¶ 13.

her termination.[157] However, she was given no advanced notice of the elimination of her position, escorted out of the building immediately following her termination, told that she would only be given a neutral job reference, and prohibited from returning to the premises. Furthermore, at no point did Hayes document that he was considering eliminating the position. Hayes later stated at an IKC budget meeting that "[i]t's my philosophy that if you're going to displace people, you have to try to find a soft landing for them. If you can't, you should at least try to find places for them to interview."[158]

- CU Holding's written policy states that "employees who have satisfactorily completed their introductory period and whose employment was terminated in good standing are eligible for rehire."[159] In Hayes' email regarding Plaintiff's termination to Rozof, he stated that Plaintiff was not eligible for rehire. Defendants argue that there is no evidence that Plaintiff was in "good standing." However, Plaintiff has presented ample evidence to support an inference that she was in good standing at the company based on numerous positive performance statements.

- Defendants have presented conflicting testimony as to when the decision to eliminate Plaintiff's position was made. Hayes testified both that he discussed Plaintiff's elimination with her in February 2016 and that he was not considering eliminating the position at that time. He also testified that he was considering eliminating her position six to nine months prior to May 2016, and at the August 2016 IKC board meeting, he stated that he made the decision to eliminate the position in March.

---

[157] Doc. 67-23 at 2:18–5:13.

[158] Doc. 67-4 at 392:12–393:19.

[159] Doc. 67-26.

- Finally, Plaintiff has presented evidence from which a reasonable jury could find that Defendants have offered inconsistent explanations for the termination. When Hayes told Plaintiff that her position had been eliminated, he did not give her any explanation or reason for the decision. Defendants argue that the decision was based on financial considerations, but after Plaintiff was terminated, Hayes stated at a CU Holding Board meeting that "part of it was a personality thing."

A reasonable jury could believe Defendants' explanation to be pretextual. Accordingly, Defendants' motion for summary judgment on Plaintiff's retaliation claim is denied.

### D.      Relationship between Mazuma and CU Holding

Defendants' seek summary judgment for Mazuma on the ground that it is not liable for CU Holding's actions. Both parties concede that the integrated enterprise test applies to the facts of this case to determine whether Mazuma and CU Holding are an integrated enterprise. The integrated enterprise test requires a court to weigh four factors: "(1) interrelations of operation; (2) common management; (3) centralized control of labor relations; and (4) common ownership and financial control."[160] Centralized control of labor relations is an important factor.[161] To survive summary judgment on her claims against Mazuma, Plaintiff must present evidence that a reasonable jury could conclude Mazuma and CU Holding "share[d] or codetermine[d] those matters governing the essential terms and conditions of [Plaintiff's] employment."[162]

Regarding the first factor,

> "[c]ourts have found interrelated operations based on (1) evidence that a parent kept a subsidiary's books, issued its paychecks and paid its bills, (2) evidence that the parent and subsidiary had

---

[160] *Sandoval v. City of Boulder, Colo.*, 388 F.3d 1312, 1322 (10th Cir. 2004).

[161] *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1363 (10th Cir. 1993).

[162] *Knitter v. Corvias Military Living, LLC*, 758 F.3d 1214, 1228 (10th Cir. 2014) (internal citation omitted).

common employees, the same headquarters, and common advertising and that the parent rented its properties to the subsidiary, and (3) evidence that the parent and subsidiary shared services, equipment, employees and office space and the parent controlled the subsidiary's payroll and benefit program."[163]

Many of the factors delineated above are present here. CU Holding leases office space at Mazuma's corporate headquarters, and IKC employees use Mazuma business cards, email addresses, and marketing materials. Mazuma Human Resources provides a large portion of human-resource functions for CU Holding, including processing payroll, check deposits, and benefits, since CU Holding does not have an independent HR department. Mazuma conducts new employee orientation for CU Holding employees and provides them with laptop computers. A reasonable jury could find that CU Holding and Mazuma have interrelated operations.

With respect to the second factor, common management, there is not a specific amount of overlap that is required to find an integrated enterprise, although there must be more than one common manager.[164] Here, Plaintiff has demonstrated that at least five individuals had roles within both Mazuma and CU Holding. Hayes was a Member of the Mazuma Executive Leadership Team and CEO of CU Holding, he represented Mazuma at a conference, coordinated interviews for Mazuma on at least one occasion, and presented a "Larry's Report" at each Mazuma Executive Leadership Team meeting. Brandon Michaels was President and CEO of Mazuma and Chairman of the Board for CU Holding. Dan Engelhard was Chief Lending Officer for Mazuma and a Board Member of IKC. Deonne Christensen served as Mazuma's Chief Operations Officer and as a Board Member for Xtracash and Simplifast. LaToya Rozof's title

---

[163] *Rowland v. Franklin Career Servs., LLC*, 272 F. Supp. 2d 1188, 1201 (D. Kan. 2003).

[164] *Frank*, 3 F.3d at 1364.

was "Vice President of Human Resources" for Mazuma and CU Holding.[165]  A reasonable jury could find that CU Holding and Mazuma have common management.

In evaluating the third factor, centralized control of labor relations, "the critical question is, what entity made the final decisions regarding employment matters related to the person claiming discrimination?"[166]  "To satisfy the control prong, a parent must control the day-to-day employment decisions of the subsidiary."[167]  Hayes made the final decision to fire Plaintiff after *consulting* with Michaels, Gleason, and others; he was told, "do what you think is the right thing for the business."[168]  Michaels testified that he did not consider himself to have given "input" on the decision, but Michaels' role in the decision is disputed. Drawing all inferences in the light most favorable to Plaintiff, the Court finds that Michaels' role in Plaintiff's termination is a genuine issue of material fact.

Finally, with respect to the fourth factor, there is clearly common ownership here: CU Holding is a wholly-owned subsidiary of Mazuma.  However, "mere existence of a parent-subsidiary relationship is insufficient to impose liability on the parent," and there is a strong presumption that a parent company is not the employer of its separately incorporated subsidiary's employees.[169]  In evaluating Mazuma's financial control of CU Holding, it is undisputed that the companies have separate financial statements, budgets, bookkeeping operations, bank accounts, lines of credit, and accounts payable and receivable.  However, the extent to which Mazuma exercised financial control is disputed.  For one, the extent to which

---

[165] Doc. 67-19.

[166] *Frank*, 3 F.3d at 1363 (quoting *Trevino v. Celanese Corp.*, 701 F.2d 397, 404 (5th Cir.1983)).

[167] *Id.*

[168] Doc. 67-4 at 357:17–358:3.

[169] *Hamilton v. Brad Sys., Inc.*, No. 04-2264-CM, 2006 WL 2522560, at *10, 12 (D. Kan. Mar. 24, 2006).

Mazuma's CEO was involved in the decision to eliminate Plaintiff's position based on financial decisions is controverted. Additionally, in December 2017, Mazuma moved a prior income stream of $17,000 from Mazuma to IKC to improve its financial appearance, suggesting some financial coordination. Whether Mazuma exercised financial control over CU Holding is a genuine issue of material fact. Accordingly, summary judgment for Mazuma on this issue is denied.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendants' motion for summary judgment is **granted in part** and **denied in part** (Doc. 63); Defendants are **granted** summary judgment on Plaintiff's age discrimination, gender discrimination, and *quid pro quo* discrimination claims; summary judgment is **denied** on Plaintiff's retaliation claim; and summary judgment is **denied** on the issue of Mazuma's liability.

**IT IS FURTHER ORDERED** that Defendants' motion to exclude expert testimony (Doc. 61) is **denied as moot.**

**IT IS SO ORDERED.**

Dated: October 15, 2018

S/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE